NBTKCABS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                    22 CR 437 (KPF)

ESTEBAN CABRERA DA CORTE,

                                   Sentence
            Defendant.

------------------------------x

                               New York, N.Y.
                               November 29, 2023
                               3:40 p.m.

Before:

               HON. KATHERINE POLK FAILLA,

                               District Judge

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
EMILY SARAH DEININGER
    Assistant United States Attorney

OSCAR RODRIGUEZ, SR.
    Attorney for Defendant

Also Present:

Jill Hoskins, Interpreter (Spanish)

1          (Case called)

2          MS. DEININGER:  Good afternoon.  Emily Deininger, on

3     behalf of the United States.

4          THE COURT:  Good afternoon.

5          If you're able to stand, I'd appreciate it because I

6     can't see you otherwise.

7          MS. DEININGER:  Sure.  No problem.

8          THE COURT:  But not, if it's uncomfortable.  Thank you

9     so much.

10          Mr. Rodriguez, sir.

11          MR. RODRIGUEZ:  Good afternoon, your Honor.

12     Oscar Rodriguez, on behalf of the defendant, and the defendant.

13          THE DEFENDANT:  Mr. Cabrera Da Corte.

14          THE COURT:  Sir, good afternoon to you.

15          MR. RODRIGUEZ:  Before the Court, thank you very much.

16          THE COURT:  Mr. Da Corte, good afternoon to you as

17     well.

18          Mr. Rodriguez, are there individuals or members of

19     family that you would like to introduce to me as well in the

20     courtroom?

21          MR. RODRIGUEZ:  No.  We have some family friends,

22     Judge, that are just here in support, but it's --

23          THE COURT:  Of course, and they're certainly welcome.

24     Thank you very much.

25          MR. RODRIGUEZ:  Thank you very much, your Honor.

NBTKCABS

1           THE COURT:  Let me, please, make sure that I have all

2      the materials that I should have.

3           I have a presentence investigation report.  It is

4      dated July 14th of 2023.  I have a defense sentencing

5      submission that is dated November 17th of 2023.  I have a

6      government sentencing submission that is dated November 24th of

7      2023.  And then I have, and just received today, a consent

8      preliminary order of forfeiture money judgment, signed by the

9      parties, and, as well, a consent order of restitution.

10          Ms. Deininger, should I have anything else from the

11     government?

12          MS. DEININGER:  No, your Honor.  That's everything.

13          THE COURT:  Thank you.

14          Mr. Rodriguez, should I have anything else from the

15     defense?

16          MR. RODRIGUEZ:  No, your Honor.

17          THE COURT:  Okay.  Thank you, as well.

18          Ms. Deininger, has the government had a sufficient

19     opportunity, under Federal Rule of Criminal Procedure 32, to

20     review the presentence investigation report in this case?

21          MS. DEININGER:  Yes, we have, and we have no

22     objections.

23          THE COURT:  Okay.  Thank you.

24          Then, Mr. Rodriguez, have you and your client had an

25     opportunity to review the presentence investigation report in

1   this case?

2           MR. RODRIGUEZ:  Yes, we have, your Honor.

3           THE COURT:  All right, sir.

4           Do you have any objections to its contents?

5           MR. RODRIGUEZ:  No objections, Judge.

6           THE COURT:  Thank you.

7           Sir, I would like to speak with your client directly,

8   if you will permit me to do so.

9           MR. RODRIGUEZ:  I have no problems, your Honor.

10           THE COURT:  Okay.

11           Mr. Cabrera Da Corte, sir, in the first instance, I'm

12   advised that we have on standby a Spanish language interpreter

13   if you would like that.  It's my understanding, sir, that

14   you're comfortable proceeding without an interpreter.  Am I

15   correct?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  All right.  And, sir, if that ever

18   changes, you'll please let me know, and we will get the

19   interpreter set up.  Please know that there is a microphone to

20   your left if you want to have a separate one from

21   Mr. Rodriguez.

22           Separately, Mr. Cabrera Da Corte, I understand from

23   your attorney that you have reviewed the presentence

24   investigation report in this case.  Is that true, sir?

25           THE DEFENDANT:  Yes, your Honor.

1    THE COURT:  Your attorney advises me that you have no

2  objections to it.  Is that also true?

3    THE DEFENDANT:  Yes, your Honor.

4    THE COURT:  At the back of the report, sir — and for

5  me, this begins at page 23 of the report — there are a listing

6  of mandatory, standard, and special conditions of supervised

7  release.  The mandatory conditions are things like you can't

8  commit another crime and you must not unlawfully possess a

9  controlled substance.  The standard conditions are things that

10  govern principally your reporting relationship with your

11  supervising probation officer.

12    And then there are special conditions that are

13  suggested.  They include a search condition, a requirement that

14  you provide the probation officer with access to requested

15  financial information, a prohibition on incurring credit

16  charges or lines of credit without approval, except in certain

17  circumstances, and undertaking or an obligation on your part to

18  obey the immigration laws and comply with immigration

19  authorities, and a recommendation of supervision in your

20  district of residence.

21    I'll ask your attorney these questions as well, but

22  have you had a chance to review these with your attorney, sir?

23    THE DEFENDANT:  Yes, your Honor.

24    THE COURT:  Do you have any objections to any of them,

25  sir?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  Is it acceptable to you if I refer to them

3    as a group without reading them word for word into the record,

4    because you've reviewed them already with your attorney?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Sir, thank you.

7          And, Mr. Rodriguez, I'll ask you the same question,

8    sir.  I understand from your client, and I just want to confirm

9    with you, sir, that you have had a chance to review the

10   mandatory, standard, and special conditions of supervised

11   release?

12         MR. RODRIGUEZ:  Yes, your Honor.

13         THE COURT:  And you have no objection to them?

14         MR. RODRIGUEZ:  No objection whatsoever.

15         THE COURT:  And is it acceptable to you, as well, sir,

16   if I refer to them as a group?

17         MR. RODRIGUEZ:  They are acceptable, your Honor.

18         THE COURT:  Okay.  Thank you so much.

19         Then, with that, I will be, for the most part,

20   adopting the presentence investigation report in this case, but

21   there is an issue that I would like to raise with the parties,

22   and that concerns what I know of as the zero points amendments,

23   or the amendments to guideline Section 4C1.1.

24         Ms. Deininger, I'm not fighting you on this.  I just

25   want to give you my thoughts on the matter.

1    The whole thing is confusing to me, and perhaps it's

2 confusing to the parties, because of the import of the word

3 "and" both before it precedes romanette x and then as the word

4 "and" is contained in romanette x.

5    I appreciate that there are decisions, the *Williams*

6 decision from Florida, the *Milchin* decision from Pennsylvania,

7 and the *Hernandez* decision from Texas, which all seem to say

8 that having a role enhancement is a disqualifying factor.  But

9 as I read the actual provision, it seems to require both an

10 aggravating role enhancement and engagement in a continuing

11 criminal enterprise, and I am confused.

12    Just to further add to the confusion, if you look at

13 the Sentencing Commission's retroactivity analysis, there was a

14 point in time when it looks like these two things, the role

15 enhancement and the continuing criminal enterprise, were

16 separate, and yet somehow they got joined in the drafting

17 process.

18    I also note that if you look in 4C1.1(a)(9), there is

19 an "or," so I am just confused.  I appreciate that the

20 government may not want to go to the mat on this or they may

21 want to, but, to me, as I read it, it seems to me that all of

22 these things have to be present, and if he has a role

23 enhancement, but does not have the continuing criminal

24 enterprise, it's not clear to me that he is foreclosed from

25 receiving the two-level reduction.  And I appreciate that that

1  was a very long windup, so I thank you.

2          MS. DEININGER:  Your Honor, I do understand the

3  confusion, but my understanding is that the drafting was --

4  this amendment is only intended to apply to defendants who do

5  not have the aggravating role enhancement, and that they have

6  to meet all of these conditions, and they can only meet

7  condition 10 if they both did not receive an adjustment under

8  Rule Section 3B1.1 and was not engaged in a continuing criminal

9  enterprise.

10         Now, the continuing criminal enterprise, I did not

11 look at this as closely, but this is, I think, a definition

12 that falls mostly in the narcotics statute.

13         THE COURT:  Yes.

14         MS. DEININGER:  Yes.

15         So I think one issue to keep in mind is that if you

16 read it the way the defendant suggested, this minor-role

17 reduction would apply to all defendants that received

18 aggravating role enhancements in any nonnarcotics offense, and

19 there's no evidence in the record to suggest that that was ever

20 Congress' intent.  I think to the --

21         THE COURT:  I'm not disagreeing with anything that you

22 are saying, and that's why I'm telling you, when you look at

23 this retroactivity analysis — and that's the document that I've

24 been looking at — I think it's a drafting error, and, yet, it's

25 the amendment that I've got.  Do I think it's a mistake?  Yes.

1    Do I think I can read past that, the inclusion of the second

2    "and"?  I don't know.  But I do appreciate what you're saying,

3    which is, you think that everything needs to be met, and that

4    it's almost as if the role enhancement is 10(a), and the

5    continuing criminal enterprise is 10(b), and you've got to meet

6    both of them.  I understand that.

7            And another way of reading it is that number 10

8    requires both.  And you're exactly right, you're exactly right

9    that this seems very strange, and it seems to have the effect

10   of qualifying a lot of folks for the zero points amendment that

11   perhaps the Sentencing Commission did not mean to, but I'm

12   stuck with the drafting.  And what's troubling me is the fact

13   that at one point, the two criteria were separate, and then

14   they somehow got joined together.  I just don't know how that

15   happened.

16           MS. DEININGER:  And, honestly, I obviously can't speak

17   to that.

18           THE COURT:  Of course.

19           MS. DEININGER:  We are both stuck with the amendment

20   we have.

21           I will say, as my reading of this, we are mostly

22   dealing with the face of the amendment because, as we pointed

23   out in our submission, there obviously has not been much

24   interpretation of this amendment yet to date.

25           THE COURT:  Oh, no, those three cases are the only

NBTKCABS

1    three cases I've found.

2            MS. DEININGER:  That's all we can find as well.

3            But I do read this as the "and" requiring both, and

4    one way -- you have to have both of those conditions to meet

5    criteria 10.  And one way to read this, and that they were

6    joined, is that there was a time in the drafting where it was a

7    defendant would have been precluded from receiving the minimal

8    role adjustment if they had been engaged in the continuing

9    enterprise by joining it.  I think the fact that you were not

10   engaged in a continuing enterprise is a necessary, but not

11   necessarily sufficient criteria to meet for the minimal role

12   adjustment.  You have to have been engaged in the continuing --

13   not engaged in a continuing criminal enterprise, but you also

14   cannot have received an adjustment under Section 3B1.1.

15           THE COURT:  I'm not sure there are any other arguments

16   to make.

17           MS. DEININGER:  Yes, I understand the Court's

18   confusion.

19           THE COURT:  To me, your strongest argument, I believe,

20   is that the Sentencing Commission could not have meant to allow

21   such wide-ranging application of this particular reduction to

22   folks who have even very high aggravating role adjustments

23   simply because they had the good fortune not to be in a

24   continuing criminal enterprise.  I understand that.  But you

25   and I will both just wonder what the drafters actually meant,

1  and I appreciate that.

2          MS. DEININGER:  And I think that is correct.  I think

3  my only point is that I don't think you have to read the

4  language to separate them.

5          THE COURT:  Okay.  I understand that.  Thank you.

6          Mr. Rodriguez, do you want to be heard on this issue,

7  sir, or do you want to stand on what is in your written

8  submission?

9          MR. RODRIGUEZ:  I would rather stand on what I have

10 written on, your Honor.  I just tend to think, your Honor, that

11 the reason that it was written the way it was written, it was

12 because sometimes the law in this particular section is to be

13 interpreted liberally to help or assist certain defendants that

14 fall within this particular category or within this particular

15 exception.  And I think that my client meets the exception in

16 this particular case.

17         THE COURT:  Okay.  Thank you.

18         Sir, while I have you standing, let me please ask you

19 a different question.

20         What is the status of your client's asylum

21 application, which I understood to have been filed in 2019?

22         MR. RODRIGUEZ:  Your Honor, it is pending.

23         THE COURT:  Pending?  Okay.

24         MR. RODRIGUEZ:  Unfortunately — and I will be frank

25 with you —

1          THE COURT:  Please.

2          MR. RODRIGUEZ:  -- this conviction throws a wrench

3    into that process.  I am not an immigration lawyer, and I don't

4    pretend to tell you something that I don't know too much about,

5    except for the fact that I believe that it's going to be very

6    difficult for him to overcome not having to stay in this

7    country.  It's going to be very difficult.

8          THE COURT:  Of course.

9          Now, I don't hear you to be saying that your client is

10   consenting to removal from this country.  You're saying he is

11   going to maintain that petition until that petition is

12   resolved?

13         MR. RODRIGUEZ:  Yes, ma'am.  At one time, he did come

14   to the United States and seek asylum because they persecuted

15   him in his country.  His family and him were persecuted in his

16   country, and he received not only some threats, but he was

17   actually beaten up and put in jail.  And after he got out of

18   jail briefly, he was able to come to the United States, and

19   came at an early age, became a student, and then, as I put in

20   my submission.  I gave you the history, your Honor, so I don't

21   want to be repeating myself as to how it was that he was

22   involved in studying engineering, and, unfortunately, you know,

23   young kids, sometimes they stray.

24         THE COURT:  Yes.

25         MR. RODRIGUEZ:  And he strayed, unfortunately, and

1  that's why we're here.

2          THE COURT:  Please finish your thoughts, sir.

3          MR. RODRIGUEZ:  I only just want -- I know that I have

4  been dealing with Ms. Deininger, and she's been very

5  professional from day one.

6          THE COURT:  No doubt.

7          MR. RODRIGUEZ:  Very strict from day one.

8          THE COURT:  Also no doubt.

9          MR. RODRIGUEZ:  But very professional 100 percent.

10  And we have tried to do whatever it was to correct the wrong

11  that we did.  Unfortunately, because of the way they look at

12  certain positions of certain people in this district, no

13  negotiations whatsoever took place.  We did do the next best

14  thing.  We stepped up, and we pled guilty early, very early, in

15  this case, not to try to delay or play with the case or with

16  the government in any way.  We came straight, I negotiated a

17  plea, we held onto the plea, and we have done as much as we can

18  to mitigate or minimize his exposure and loss in this very

19  serious matter, which we realize is a matter where a young man

20  that got involved in this, and, you know, it got out of hand.

21  And I'm the first one to recognize that.

22          However, by the same token, your Honor, I'd like the

23  Court to take into consideration, this happened at a very young

24  age.  He's still a very young man.

25          I guess I'm getting old --

1    THE COURT:  Not at all, sir, but I just want to stop

2    you for one moment, please, because I promise you, I'm going to

3    give you a chance to give me your main sentencing presentation.

4         I'd like to go off the record for just a moment.

5         MR. RODRIGUEZ:  Yes.

6         (Discussion off the record)

7         THE COURT:  We're going back on the record.

8         I appreciate the clarification that there was no

9    cooperation in this case.

10        MR. RODRIGUEZ:  We tried, but --

11        THE COURT:  But there was none?

12        MR. RODRIGUEZ:  I could never meet Ms. Deininger's

13   standard for that, but I tried.

14        THE COURT:  Okay.  I appreciate knowing that, sir.

15        I'll let you sit down for a moment.  I want to talk to

16   the government a little bit more.  Thank you.

17        Ms. Deininger, on the last issue that I just discussed

18   with Mr. Rodriguez, I'm happy to have that at the highest level

19   of generality as possible or something more, if you think

20   there's anything more that needs to be placed on the record.

21        MS. DEININGER:  Your Honor, there were discussions

22   between counsel only, and the government determined that the

23   defendant would not be able to provide any substantial

24   assistance to the government's investigation.

25        THE COURT:  Okay.  Thank you so much.

NBTKCABS

1          Ms. Deininger, a separate question for you, please:

2     At page 2 of your sentencing submission, there is a discussion

3     for which I don't have information in the record other than

4     what you're telling me, and that is, in the presentence

5     investigation report, Mr. Cabrera Da Corte identifies an

6     individual from whom he claims he learned the scams that he

7     later perpetrated, and it looks to me as though the government

8     builds on that and says, yes, they include running up charges,

9     using stolen credit cards.  I don't know where this information

10    came from, and if it's in the presentence investigation report,

11    I'd be grateful if you could point it out to me; if it comes

12    from the government's investigation in this case, you can tell

13    me that, too; if it comes from proffer sessions, then I need to

14    be sure I can consider it.

15         So, really, what I'd like to know is where did this

16    come from, and do you believe I can consider it at sentencing?

17    If so, why?

18         MS. DEININGER:  It is not in the presentence

19    investigation report.

20         THE COURT:  Okay.

21         MS. DEININGER:  It is information that the government

22    obtained through the interview of witnesses and that the

23    government found -- multiple witnesses that the government

24    found to be reliable and corroborated by other evidence in its

25    investigation.

1          On that basis, we do believe you would be able to rely

2     upon it at sentencing.

3          THE COURT:  Okay.  Just one moment, please, excuse me,

4     as I pull up my computer.

5          You're saying, under the rights that I have under

6     Section 3661 of Title 18 of the United States Code, I can

7     consider anything, and this would be part of the universe of

8     materials that I could consider?

9          MS. DEININGER:  That's correct.  It is the sort of

10    thing that if your Honor needed to hear from a witness, we

11    certainly could bring one before you.  We do not have one here,

12    but I can proffer that witnesses told us about these schemes,

13    that they had personally participated in them with the

14    defendant who is being sentenced today.

15         THE COURT:  Prior to the scheme that brings us here

16    today?

17         MS. DEININGER:  That's correct.  In 2019 specifically,

18    in the lead-up to the scheme that brings us here today.

19         THE COURT:  Do I understand that as part of your main

20    sentencing presentation, that you might be calling my attention

21    to this information as I think on what sentence to impose, or

22    is it more, for lack of a better term, sort of optics or

23    peripheral information that I have?

24         MS. DEININGER:  We were not planning to call your

25    attention to it any further than what we had in the sentencing

1   submission, but we did think it was relevant context,

2   especially thinking about the lack of prior criminal history

3   and in response to some of the defense arguments.

4           THE COURT:  Okay.  Just stay there for just a second,

5   please, in case I have additional questions.  I just want to

6   make sure I have asked them.

7           Okay.  Thank you very much.

8           MS. DEININGER:  Thank you.

9           THE COURT:  So, Mr. Rodriguez, then I return to you,

10  sir.  Again, this is not your main sentencing presentation,

11  this is just the opportunity to clarify for me some things that

12  are unclear.

13          If you look at the government's sentencing submission,

14  sir, it is the second to last paragraph on page 2, and it talks

15  about schemes in which your client was involved in or about

16  2019.

17          First of all, have you seen that paragraph, sir?

18          MR. RODRIGUEZ:  Yes, your Honor.

19          THE COURT:  Are the facts that are contained in that

20  paragraph accurate?

21          MR. RODRIGUEZ:  Well, we would like to take an

22  opposite position on that, Judge.

23          THE COURT:  Let me hear it, please, sir.

24          MR. RODRIGUEZ:  Frankly, this was conduct that was not

25  charged.  This was conduct by witnesses that I have not had the

NBTKCABS

1   opportunity to cross-examine, nor that I have had an

2   opportunity to even review a report where I could review or

3   give you a different version.

4           I can only say that I thought, and I would make

5   reference to page 4 of the -- page 5 --

6           THE COURT:  Of the government's submission or yours?

7           MR. RODRIGUEZ:  The government's submission.

8           THE COURT:  Yes, sir, I'm there.

9           MR. RODRIGUEZ:  The third paragraph from the top.  At

10  the bottom, it says, "Indeed, as noticed above, the charged

11  offense was not the defendant's first scam," which basically

12  refers back to what you were telling me, "prior to perfecting

13  his cryptocurrency reversal scheme of the defendant, and that

14  he participated in other fraud schemes using stolen credit

15  cards and information."

16          This was basically, Judge, conversations of witnesses

17  trying to better their position.  I have never been able to

18  confront that, and I would --

19          THE COURT:  Do you dispute it, sir?

20          MR. RODRIGUEZ:  Yes, ma'am, I dispute it in the sense

21  that I don't think that the defendant was as much a principal

22  as the government was led to believe.

23          THE COURT:  That's a different -- you're not quite

24  answering my question.

25          MR. RODRIGUEZ:  I apologize.

1          THE COURT:  No, no, no, that's okay.  You're being

2     very precise, and I want to be equally precise, sir.

3          Was your client involved in a stolen credit card

4     scheme in any capacity in or about 2019?

5          MR. RODRIGUEZ:  He told me it was not his scheme, it

6     was somebody else's scheme.

7          THE COURT:  That's fine, it can be someone else's

8     scheme.  He's telling me that this cryptocurrency scheme came

9     initially from somebody else.  Did he participate in it, sir,

10    in any capacity?  And if you want to tell me you're not going

11    to answer that question, and if the government wants to pursue

12    it --

13         MR. RODRIGUEZ:  If I may have just one moment?

14         THE COURT:  Take whatever time you need with your

15    client, sir.

16         MR. RODRIGUEZ:  The government has been very specific,

17    and there's always something I may not know, Judge.

18         THE COURT:  Take whatever time you need.  I would just

19    ask you to turn your microphones to the side so I don't

20    mistakenly hear your conversations.  Thank you.

21         (Counsel conferred with defendant)

22         MR. RODRIGUEZ:  Judge, for the record, his involvement

23    in the credit card scheme, which he was not charged with, was

24    basically that some other principals who turned state or

25    government witnesses, asked him for his credit card.  He

1  allowed his credit card to be used.  There was some benefit on

2  it, but this was not something that he was involved with or

3  this was not a line of crime that he was involved with.  This

4  was something that he was asked.  It was a very limited

5  exposure, but this is not something that he was a principal in.

6          THE COURT:  Okay.  Thank you very much.

7          Ms. Deininger, if I could just return to you for a

8  moment.  It seems to me that the parties dispute what facts,

9  what is the evidence, that I may consider.  So my view is the

10  following, and I will certainly hear from the parties if they

11  hold a different view:  If you want to go forward today, I

12  think I can consider exactly what Mr. Rodriguez has admitted to

13  on behalf of his client and no more, and that you would limit

14  your arguments to that.

15          If you believe that it is important to me that I

16  consider this other information, then I do think we'd have to

17  have a more involved *Fatico* hearing, perhaps with witness

18  testimony or with evidence.  If you want that, we'll set it.

19  If you don't think it's necessary for today, then we'll just

20  leave things where they are right now.

21          MS. DEININGER:  Your Honor, I think it's sufficient

22  for us to leave things where they are right now.  The

23  government's point in raising this was that, again, involvement

24  in the cryptocurrency scheme was not a one-time event, and that

25  the defendant was involved in kind of an extended course of

1  fraudulent activity, and that part of that was at least some

2  participation in this earlier credit card scheme, and I think

3  that that point is now undisputed.  We do not need to have a

4  *Fatico* as to his role in that earlier credit card scheme.  I

5  think that he has acknowledged that he was involved in an

6  earlier scheme at least in some way, and that is something your

7  Honor can consider in terms of thinking about, again, the lack

8  of criminal history, in fact, there was fraudulent activity

9  here that covered a course of a number of years.

10            THE COURT:  All right.  Thank you so much.

11            Mr. Rodriguez, Ms. Deininger believes that we're fine

12  where we are.  Are you --

13            MR. RODRIGUEZ:  I can live with that, Judge.

14            THE COURT:  All right.  Then thank you.

15            I appreciate the time and the attention you've each

16  given me to help me understand these remaining issues.

17            Ms. Deininger, I'm going to hear you now with respect

18  to the government's main sentencing presentation.  If I could

19  just ask you, please, not to say we rely on our written

20  submission.

21            MS. DEININGER:  Okay.

22            THE COURT:  Thank you.

23            MS. DEININGER:  Yes, your Honor.

24            So the government, as we said in our written

25  submission, we are seeking a guideline sentence here.  The

1  stipulated guidelines range was 78 to 97 months, and we do

2  believe that would be appropriate here.

3       The primary reasons have to do with the seriousness of

4  the offense, as reflected in its scope and complexity, and the

5  defendant's leadership role.

6       So with regard to the offense:  This was a fraud

7  scheme that involved multiple lies at multiple levels.  And,

8  first, there were lies to the victim here, the cryptocurrency

9  exchanges, namely, Coinbase, and that false identities and

10  false information was used to open accounts.  And then, on a

11  second level, after cryptocurrency had been purchased and

12  transferred to wallets that the defendant and his

13  coconspirators controlled, they then called the banks that the

14  money had originally came from and falsely claimed that the

15  funding transactions had been unauthorized, a lie to the bank

16  that then led the bank and the cryptocurrency exchange to

17  reverse the transactions and allowing the defendant and his

18  coconspirators to essentially double their money, withdraw the

19  money that had been used to buy the cryptocurrency, even though

20  they already had the purchased cryptocurrency in hand.

21       THE COURT:  I'm not meaning to be pedantic here, but I

22  want to make sure I understand.  At the end of the reversal of

23  the transaction, the participants in that particular

24  transaction, or the coconspirators, had both the money that was

25  initially transferred to purchase the crypto and the crypto

1   that was purchased with that money.  That's the doubling of the

2   money, is that you had an equivalent amount of cryptocurrency?

3           MS. DEININGER:  That's exactly right, yes.

4           THE COURT:  Okay.  Thank you.  I'm asking because I

5   myself own no cryptocurrency.

6           That cryptocurrency, was that, in fact, transferable

7   at that value?  If I had a hundred dollars of crypto, could I

8   sell that for a hundred dollars?  My sense was that

9   cryptocurrency values fluctuated.

10          MS. DEININGER:  They certainly do.  At that time, you

11  would have been able to sell it for very close to that amount

12  because we're talking about a very close time frame.  So they

13  used fiat, the actual currency, to buy the cryptocurrency for

14  approximately that amount and then transferred it out.  The

15  reversal and withdrawal from the bank accounts happened usually

16  only approximately a week later.  It is certainly possible that

17  there had been some sort of fluctuation in the cryptocurrency

18  prices, but at that time, they, roughly, were able to double

19  their money.  What happened down the road would, absolutely,

20  depend on how it changed in the Bitcoin or Ethereum or whatever

21  cryptocurrency it was that they had purchased, how that value

22  shifted.

23          THE COURT:  Of course.

24          Well, to that exact point — you've anticipated my next

25  question — was the idea of the scheme that you'd get your money

1   back — great — and then you could sell the crypto immediately,

2   or was that held, or did it vary?

3           MS. DEININGER:  Our understanding is that in most

4   cases, the cryptocurrency was sent to wallets controlled by one

5   particular individual, whose role was to provide cash in

6   exchange for the cryptocurrency in exchange for a cut, a

7   commission.  And so the defendant and his coconspirators were,

8   within a very short time frame, getting an almost equivalent

9   amount of cash.

10          THE COURT:  Okay.  I understand that.

11          Because I'm just trying to think about the time frame,

12  and, again, there were periods of time where crypto was in

13  flux.  I appreciate that.  Please continue with your

14  presentation.

15          MS. DEININGER:  I think I was just speaking about the

16  scope.  Again, one thing that we think warrants a guideline

17  sentence here is, you can see the scope not only in the length

18  of time for which this was running, and our understanding is it

19  was essentially from the beginning of 2020 up until the time of

20  the defendant's arrest in August 2022 — I think the period

21  charged was 2020 to March 2022 — but also in the number of

22  accounts and the amount of money that had to be used.  Most of

23  these reversal transactions weren't for huge amounts — we're

24  talking about 15,000, 20,000, 30,000 dollars — but it was done

25  over and over and over again.

NBTKCABS

1          We identified, with Coinbase's help, over 160 Coinbase

2     accounts that were used in this scheme, many of which were

3     opened up under fake identities, and, in total, Coinbase lost

4     more than -- just Coinbase lost more than $3.5 million.

5          And our investigation showed that there were also

6     other cryptocurrency exchanges that were impacted.  We do not

7     have a loss amount or a good estimate on the number of counts

8     on those, so I'm going to rely primarily on the information we

9     have about Coinbase here, but part of that is because it is so

10    incredibly difficult to trace all of the accounts and the money

11    because of the way that it was opened under such an extremely

12    large number of names and linked to so many different bank

13    accounts.  So we just don't have a good estimate of how broadly

14    the scheme might have impacted other cryptocurrency exchanges.

15         THE COURT:  You mentioned a moment ago that the scope

16    can be demonstrated by the number of accounts.  And I presume,

17    as well, that another metric was the number of coconspirators

18    involved.

19         Is it the government's position that -- well, I

20    believe you said there were dozens of coconspirators.  Are you

21    including the folks who just gave up their personal identifying

22    information to be used in the setting up of accounts?  And did

23    you understand that folks who did that did so understanding

24    what it was going to be used for, or something else?

25         MS. DEININGER:  When I refer to dozens, I am referring

in many cases to people that just provided information that

could be used to open accounts, because our investigation

showed that, in most instances, they understood how that

information was going to be used and, in fact, made a cut of

the money from the transactions that their accounts were used

for.  For example, if an individual's bank account was used for

a $20,000 reversal scheme, that they usually got to keep

approximately a 20 percent cut, and so they would have gotten

$4,000 from that.  And that many people whose identifying

information was used to open accounts was also used over and

over, so even relatively lower-level participants might have

had three, four, or five different bank accounts linked to

different Coinbase exchanges.

        While we believe that Esteban Cabrera Da Corte was

really the most culpable member of the team — he was at the top

of the pyramid — there were other individuals kind of at a

midlevel tier underneath him whose primary responsibility was

to recruit all of these other people whose identifying

information could be used, and coordinate the process with

them, help them pass on the cash to fund the bank accounts,

know when to make the calls to the banks saying that these

transactions had been unauthorized.

        So, in that, and the level of coordination that's

required to be done because of these large number of people, it

is actually a quite complex and expansive scheme and is, I

think, as the defendant has acknowledged, and as the PSR sets

out, was really the defendant's only source of income.  This is

how he is making his money throughout 2020, throughout 2021,

and up to the time of his arrest.

THE COURT:  Again, I'm not meaning to go off on

frolics and detours here, but --

MS. DEININGER:  No, I appreciate all the questions.

THE COURT:  -- in some instances, people are using

their real names and identifying information, and in some other

cases, they're using names that are very close to their names

and identifying information, correct?

MS. DEININGER:  That's right.  I'm speaking very

generally here, but what we saw in our investigation is that

usually the first time that anyone was involved, they would use

their real name.  However, they could only open up one Coinbase

account under any given name, so in order for that person to

stay involved, they would open up multiple bank accounts in

your name, but only one Coinbase account.  So they would start

linking the bank accounts after the first attempt to names that

appeared to be very similar, that used someone's middle name or

they just changed a letter, and, in some cases, those names

appear to have just been made up out of convenience.  But in

many instances, they worked with another coconspirator who

scoured PII available on the internet and the dark web for PII

of real people who had similar names, because then they had

1  real dates of birth and real information that could be put into

2  the account applications for Coinbase and would pass an

3  identity verification process, which Coinbase did have in place

4  and was something that the defendant and his coconspirators had

5  to learn to circumvent.

6          And so that is really where you saw the theft of real

7  people's identities come into play in this process.

8          THE COURT:  You're anticipating my question, which is:

9  Additional to Coinbase and whatever it suffered, are there

10  people walking the land who have bad credit reports or credit

11  issues because of the use of their names unwillingly in this

12  scam?

13          MS. DEININGER:  There are certainly people whose names

14  and identities were used in the scam who are probably

15  completely unaware of it — I cannot speak to how their credit

16  reports have been impacted — but who probably have no idea that

17  there is a Coinbase account that's been out there opened in

18  their name and has been flagged for fraud --

19          THE COURT:  Yes.

20          MS. DEININGER:  -- and would only run into that if

21  they themselves tried to open up a Coinbase account.

22          THE COURT:  I understand if someone voluntarily gave

23  their names, I'm feeling less bad for them, but I was just

24  wondering if there were additional victims — and you see me

25  using air quotes there — who did not know that their names were

1    being used.

2              MS. DEININGER:  Absolutely.  We interviewed people who

3    fell into that bucket and very credibly said that they had no

4    idea because they lived in other states, they had no connection

5    to the coconspirators, and they had names that mirrored

6    coconspirators that we have charged.

7              THE COURT:  Okay.

8              MS. DEININGER:  So the other aspect we really do

9    believe supports a guideline sentence here, in respect to this

10   defendant, is the leadership role that he played.  He was the

11   person that was -- our understanding is that he is the person

12   that kind of ran the entirety of the scheme, that he was the

13   person that was teaching people how to run it, teaching people

14   how to make the calls to the bank falsely claiming that the

15   transactions were unauthorized, he was the person directing

16   people how much cryptocurrency to buy, where to transfer it,

17   when to do these transactions, and, in many cases, providing

18   the initial funding for the reversal transactions that then

19   occurred.

20             He was the primary point of contact with the

21   recruiters at the middle level, who would bring him these new

22   people whose identifying information could be used to open up

23   bank accounts and Coinbase accounts, and also kept a very large

24   share of the profits.  Our understanding is for every one of

25   these reversal transactions, that Esteban Cabrera Da Corte

1    received approximately 30 percent of the profits that they

2    received, and, again, the rest is kind of split among other

3    players.

4            THE COURT:  Safe to say about 20 percent went to the

5    person whose name got used?

6            MS. DEININGER:  That's my understanding, about

7    20 percent to the person whose name got used, 30 percent to the

8    defendant here — I'm forgetting the full breakdown now — and

9    then the rest of it was split between usually the midlevel

10   recruiter that was also involved in that particular

11   transaction.  My understanding is that there were essentially

12   funders who provided some of the money upfront, and so, in

13   those cases, they would also get a cut, and, as I mentioned

14   earlier, the person that was responsible for converting the

15   cryptocurrency into cash.  So these are all, also, other

16   parties that took some share of the profits, but

17   Esteban Cabrera Da Corte was regularly getting approximately

18   30 percent of the millions of dollars that this scheme made.

19   He is running it, he is continuing to direct people to bring

20   new people in.

21           When they start using fake IDs and real people's

22   personal identifying information, he is the person that

23   connects the midlevel recruiters to the people that can provide

24   that PII and those fake IDs and tells them how to get them,

25   that they can order fake driver's licenses if they can provide

1    their PII through a Telegram bot named Zeus, that if they reach

2    out to this particular individual, that they will be able to

3    give him a real person's -- a given name, say Jane Doe, and

4    that he will provide you with a list of all the Jane Does in

5    the country whose PII could be used to open up Coinbase

6    accounts.  And the defendant is the person who was connecting

7    all of these people for the scheme to operate.  That is also a

8    significant factor that increases his culpability and warrants

9    a guideline sentence here.

10          I think those are the main reasons I want to

11   highlight.  I know you said since I don't want to rely on my

12   sentencing submission --

13          THE COURT:  Well, I didn't want you just to sit down

14   and say look at that.

15          Perhaps, if you would, would you please engage with

16   some of the issues that are raised in the defense submission?

17   For example, I don't think you dispute that

18   Mr. Cabrera Da Corte did, in fact, plead early.  Based on my

19   presiding over this case, it appears that he was an early

20   guilty plea.

21          MS. DEININGER:  Yes.

22          THE COURT:  It sounds as though there came a point

23   early on where he accepted responsibility.  I don't get the

24   sense, although you'll tell me if you disagree, that he is

25   today minimizing what he did in the charged offense, and this

1    is his first conviction.

2              MS. DEININGER:  We do not dispute any of that.

3              THE COURT:  Okay.

4              MS. DEININGER:  He was the first person to plead

5    guilty in this case.  He has fairly quickly accepted

6    responsibility for his role in this charged offense.  And that

7    is certainly a mitigating factor that would be appropriate for

8    your Honor to consider.

9              THE COURT:  Okay.  But you don't believe it warrants a

10   below-guideline sentence?

11             MS. DEININGER:  We don't.  I think, as we raise in our

12   sentencing submission, there were other -- we, obviously, in

13   reaching a plea negotiation, did not pursue certain charges.

14   One of those is the aggravated identity theft, which we believe

15   the facts would have fully supported here and would have

16   required a two-year mandatory minimum.  I think that some of

17   these mitigating factors are things that we considered in

18   entering into the negotiated resolution that we did.  So we

19   still believe a guideline range is appropriate.

20             THE COURT:  I appreciate that, and I don't want to

21   sound too critical in response to that.

22             You've made the choices you've made about the guilty

23   plea.  To a degree, your decisions with respect to the

24   discretion I have, I'm not sure -- I'm not sure it's enough for

25   you to say, Failla, don't vary downward because we did the work

1   for you in not giving the 1028(a) charge, but I appreciate that

2   that is an argument that you're making.  I'm just telling you,

3   from sitting here, it doesn't really -- there are stronger

4   arguments you can make, but I appreciate you saying that.

5           Other things you'd like me to know?

6           MS. DEININGER:  Not that I think aren't set out in our

7   sentencing submission.

8           In thinking about the fact that the defendant does not

9   have any prior criminal history, as your Honor just pointed

10  out, I think it is worth noting that he also has no history of

11  legitimate employment or legitimate activity here in the U.S.

12  And our understanding is that he fairly quickly, after coming

13  to the U.S. in 2017, did get involved in this world of scams,

14  and that that became his life here in the U.S., despite, at the

15  same time, applying for asylum and the benefits that this

16  country has and that sort of benefits that this country could

17  offer him.

18          Again, that kind of goes back to the scope of the

19  offense, your Honor, and the fact that it is running for --

20          THE COURT:  Slow down, please.

21          MS. DEININGER:  Sorry.

22          Going back to the scope of the offense, the fact that

23  this is something that is running for a number of years, that

24  it is really -- that the defendant, for this period of time, is

25  committing himself to making his living through fraud and

1    bringing a number of people into this offense conduct, all are

2    things that we believe support a guideline sentence here.

3              THE COURT:  Thank you very much.

4              Mr. Rodriguez, I'd be happy to hear from you in

5    response, sir.  I know you disagree with the government, and I

6    promise you, I have read your submission, but please tell me

7    the things that are here or that you would also like me to

8    know.

9              MR. RODRIGUEZ:  Just briefly, your Honor, and I will

10   rely on my submission.

11             Judge, every once in a while, it becomes very

12   difficult to try to get a case into a situation where it will

13   be a bit more favorable for my client.  We tried, from the

14   beginning, to be as open and sincere with the government.  We

15   accepted responsibility immediately.  We worked out a plea as

16   soon as it was possible.  And we attempted to try to cooperate

17   in an effort to help my client get a 5K1 or try to reach

18   something like that.  It was not accepted.  We tried.  You

19   know, you can't win them all.  I understand that.

20             However, Judge, I think that the government is being a

21   bit harsh in the sense that she says, for example, that from

22   the time that he came to the United States, there was nothing.

23   From the time that he came to the United States, for a period

24   of time, he was a college student.  He was a college student

25   for, I believe, the first two years that he was here, and then

1    he fell into this particular loose group of individuals, who,

2    even though he is regarded as a head or one of the main

3    characters in this, it was really not a hierarchy of people.

4    It was a loose group of people; some guys would do the

5    recruiting, some guys would have the contacts in the banking,

6    and some guys did the computer work or the computer work that

7    my client did.

8           What I'm trying to say, Judge, is that this is not a

9    pyramid of things where my client was the main guy on top doing

10   all kinds of things.  This was just a young man with certain

11   knowledge of how to work through the computer, and he got

12   involved in this.  We accept that.

13          THE COURT:  But you also stipulated to a role

14   enhancement for being a manager, leader, organizer, supervisor.

15          MR. RODRIGUEZ:  Yes, your Honor.

16          THE COURT:  You're not walking away from that, right?

17          MR. RODRIGUEZ:  I'm not walking away from that.

18   I realize that he had a certain degree of knowledge that other

19   guys did not have, and that's why it was applied.

20          By the same token, Judge, in the sense of trying to

21   persuade the Court to adopt a 4C1 adjustment, and also in

22   trying to also go for the reasonableness of the sentence here,

23   Judge, keep in mind, we pled to 3,578,000-some dollars.  Had we

24   been able, or had this been $78,000 less than what we're

25   talking about of a loss, we could have been two points below.

1    I'm only trying to do this because I'm trying to incorporate

2    all this into the 3553, which I'd ask the Court to consider the

3    age of the individual, his background, his record, the fact

4    whether he is going to do it again or not do it again, and the

5    fact that this is a young man whose life should not be lost,

6    should not -- a long period of incarceration is not going to

7    teach him much more than a period of incarceration would teach

8    him.  I'm not asking today for a short period of incarceration.

9    I'm asking for an adjustment down, that the Court would find an

10   adjustment down, a little bit somewhere below what the medium

11   is for the country, below what is recommended or what is

12   pointed out by the probation officer, and, basically, Judge,

13   I'm asking for a sentence of somewhere about 36 months

14   incarcerated.  That way, he learns his lesson, it does not

15   destroy all of his life, and, by the same token, he can resume

16   his life at sometime down the road and try to get on with his

17   life, whether here or in another country.

18            THE COURT:  Sir, thank you very much.

19            Was there anything else in the government's sentencing

20   presentation to which you wanted to object or oppose?

21            MR. RODRIGUEZ:  No, Judge.  Ms. Deininger has been

22   very professional.  We think she's been very straight with me,

23   I hope I have been just as straight with her, and I wish I

24   didn't understand her as well as I do sometimes, but it just

25   happens.  We understand each other.  We have been able to work

1    these matters out, and, hopefully, we have a -- of course, she

2    has a job to do, and she has a job to persuade the Court; I

3    have a job to do, I have a job to persuade the Court.  I can

4    only tell you sometimes every once in a while -- like I was

5    telling before, every once in a while, you get to know a

6    certain particular defendant, maybe because of his young age,

7    maybe because of the way that he behaves himself around me.

8    He's been very respectful, very understanding, we've gone

9    through this.  Frankly, when he came into my office, I knew

10   very little about crypto or anything.  To me, this was brand

11   new, and I learned the ropes.  He tried to teach me as much as

12   we could in an effort to try to get over the hump and try to

13   cooperate.  We were unable to.  But, by the same token, he

14   never said no to reaching some kind of an agreement, to trying

15   to put this behind him, and to trying to get on with his life.

16           He has a small child, he has a family, and once in a

17   while, we make mistakes.  We have to live with our mistakes,

18   but, by the same token, we're asking the Court for a reasonable

19   sentence that will meet the purpose of the sentencing

20   guidelines, will meet the purposes of a sentence to send out a

21   message, and, by the same token, not destroy this young man's

22   life.

23           I think my client would like to address the Court.

24           THE COURT:  Yes, I would welcome that.

25           MR. RODRIGUEZ:  And I thank the Court for allowing me

1   to practice in front of you.  I appreciate it.

2               THE COURT:  My privilege, sir.  Thank you.

3   Absolutely.

4               MR. RODRIGUEZ:  Thank you so much.

5               THE COURT:  Mr. Cabrera Da Corte, as your attorney

6   just mentioned, you are entitled to speak with me at this time

7   if you'd like to do so.  You're not obligated to speak with me,

8   but you are invited, and if there's something you'd like to

9   say, I will take it seriously, as I do all things, as I

10  consider what is an appropriate sentence to impose.

11              Would you like to speak at this time, sir?

12              THE DEFENDANT:  Yes, your Honor.

13              THE COURT:  What I will just ask, because you've not

14  been in this courtroom as often as I have, if you could be a

15  little slower and a little louder than you think you need to,

16  so we all can hear you.

17              You may begin when you're ready.

18              THE DEFENDANT:  Okay.

19              First of all, I want to say sorry for what I did,

20  because I know it was bad.  I know it was not a good way to get

21  money.

22              When I get to this country, I come with a student

23  visa.  My family are civil engineers.  They live here in

24  New York, and they pay my rent and everything until 2020.

25  Next, I live in Miami, and I know -- I meet some people, and I

1  get involved in this.  That was how everything begins.

2           I actually feel really regret for what I did because I

3  have -- I going to lose time with my baby, and I going to make

4  a lot of pain to my family.

5           THE COURT:  Your child is not in this country at this

6  time; your child is in Venezuela right now?

7           THE DEFENDANT:  He is with Venezuela.  When all this

8  happened, the mother get, like, crazy.  She tried to kill

9  herself and --

10           THE COURT:  I'm sorry to hear that.

11           THE DEFENDANT:  Yeah, it was -- when all that happen,

12  I call her parents, and I send to her, and she got a

13  psychiatric, and the baby is living with her right now.

14           THE COURT:  With her and with her parents?

15           THE DEFENDANT:  Yeah, your Honor.

16           THE COURT:  So you have comfort that the baby is well

17  cared for because of her parents?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  I understand, sir.

20           Please continue.

21           THE DEFENDANT:  Because of that, I couldn't see my

22  baby in all this time, from September to here, to right now,

23  because she didn't want to come to bring me my baby.

24           Like all this time, my family was always supporting me

25  in almost everything right now, and, like I told you, my

1  family, they are really well to finance everything to me, yeah.

2          Yes, your Honor, I just want to end this.  That's why

3  I speak with my lawyer and say that if I can say I'm guilty

4  faster, I'm going to agree with that, because I just want to

5  end this and have a chance to get my life again and be with my

6  baby again and not cause more pain to my family.

7          THE COURT:  Is there anything else you'd like me to

8  know, sir?

9          THE DEFENDANT:  Not at this time.  I don't --

10         THE COURT:  Okay.  Thank you.

11         And, please, you'll know that I also read the very

12 fine sentencing submission that your attorney submitted, so I

13 do have that information as well.

14         Let me, please, do this.  Mr. Cabrera Da Corte, when I

15 sentence people, I do not come on the bench with a sentence in

16 my head.  I need to hear from everybody, and I've now heard

17 from everybody, and, in particular, I've heard from you.  I

18 need about ten minutes' time, sir — perhaps more, perhaps

19 less — to gather all of the notes that I've taken in today's

20 proceeding and make sure that I've thought about them

21 sufficiently in determining what is an appropriate sentence.

22         So I'm going to step off the bench for a little while,

23 and I will come back as soon as I can.  I just want to

24 underscore, sir, I'm not doing this to heighten the drama of

25 this moment, it's anxiety-inducing enough, but it's easier for

1    me, it's better for me, it's fairer for me, if I keep an open

2    mind until I hear from everyone, and I've now done that.

3            If folks need to step out for a moment or two, you're

4    welcome to do that.  I'll be ready in about ten minutes.  So,

5    thanks very much.

6            (Recess)

7            THE COURT:  I'm going to outline the sentence I intend

8    to impose, but I will give each side an opportunity to make

9    legal objections before the sentence is actually imposed.

10           We have talked this afternoon about certain of the

11   sentencing factors that are set forth in Section 3553(a) of

12   Title 18 of the United States Code.  And they include the

13   nature and circumstances of the offense; the history and

14   characteristics of Mr. Cabrera Da Corte; the need for the

15   sentence imposed to reflect the seriousness of the offense, to

16   promote respect for the law, to provide a just punishment for

17   the offense, to afford adequate deterrence to criminal conduct,

18   to protect the public from further crimes by

19   Mr. Cabrera Da Corte, to provide him with needed education,

20   vocational training, medical care, or other correctional

21   treatment in the most effective manner.

22           I must consider the sentencing guidelines and any

23   applicable policy statements, I must consider the need to avoid

24   unwarranted sentence disparities among similarly situated

25   defendants, and I must consider the need to provide restitution

1    to the victims.

2         Let me talk about my guidelines calculations, which,

3    for reasons that will not be entirely surprising to the

4    parties, are a little bit different than what the parties have

5    stipulated to.

6         I find a base offense level of 7 under guideline

7    Section 2B1.1.  I find an 18-level enhancement for the loss

8    figure of 3.5 to 9.5 million, which counsel notes is just over

9    the threshold of that.  I note, as well, a two-level

10   enhancement for the use of authentication features and a

11   four-level enhancement for leadership role.

12        I've spent a lot of time trying to figure out the new

13   zero points amendments and the resulting guideline change at

14   4C1.1, and I appreciate the engagement that Ms. Deininger had

15   with me this afternoon.

16        I know what they intended to do, and I'm confident

17   that they intended to do exactly what Ms. Deininger said, and I

18   see that when I look at the retroactivity analysis that was

19   done by the Commission.  I fully believe that they intended the

20   provision to apply as the government suggests, but something

21   happened in the drafting process, and now criteria 10 is done

22   in the conjunctive and not in the disjunctive, and I see that.

23   I also see that no one has adopted my interpretation.  I

24   understand that.  I know that three courts have found

25   otherwise.  They have not really gotten into the meat of the

1    statute, but I understand that.

2           In all likelihood, some day the Second Circuit will

3    say that my interpretation flies in the face of the

4    Commission's intent or flies in the face of common sense, and I

5    understand that.  Not only that, I fully expect that sometime

6    next week, I will be speaking with people at the Sentencing

7    Commission, and I will let them know that I don't understand

8    what their new amendment provides, so it would be really nice

9    if they could help me out.

10          But for now, based on the rule of lenity, I find that

11   Mr. Cabrera Da Corte qualifies for the two-level offense level

12   reduction in 4C1.1, and with that, and the three-level

13   reduction for acceptance of responsibility, he has an adjusted

14   offense level of 26, and I will be making those changes to the

15   presentence investigation report as a result, and with Criminal

16   History Category I, the resulting guidelines range is 63 to

17   78 months.

18          The parties have also done a great job this afternoon

19   in explaining to me why they believe the sentence they are

20   advocating for is the best balancing of the 3553(a) factors.

21   And I appreciate, in particular, the government's recognition,

22   and the defense's explanation, that here, Mr. Cabrera Da Corte

23   has pleaded early, it appears that he has fully accepted

24   responsibility, he has no prior convictions, he has committed

25   to me that he is not going to do this again, he has plans for a

1  law-abiding life and to return to civil engineering, which

2  seems to be a family business.  And so I appreciate all of

3  those things.

4          But I am also looking at what's on the other side of

5  the ledger.  It is true that Mr. Cabrera Da Corte did not come

6  to this country and immediately engage in criminal activity,

7  but it also troubles me that there came a point where he

8  abandoned his education, and instead of turning to legitimate

9  employment, turned to the fraud that is before me now.

10          It concerns me that the scheme persisted for almost

11  two years, that it involved dozens of coconspirators and

12  millions of dollars in losses.

13          There were, as I understand it, hundreds of individual

14  transactions.  More than that, I'm concerned about

15  Mr. Cabrera Da Corte's role.  He appears to have taught others,

16  supervised others, directed others, and taken a greater share

17  of the proceeds than others.

18          It's also not lost on me that he is the reason why I

19  have three other defendants before me in this case.  This is a

20  serious case, and it was not a one-time youthful indiscretion.

21          So while, as I've noted, I am giving the reduction for

22  the zero points amendment, I do that while acknowledging that

23  Mr. Cabrera Da Corte is not the defendant, and this is not the

24  case for whom that reduction was designed.

25          Had the range been the parties' stipulated guidelines

NBTKCABS

1    range of 78 to 97 months, I might have thought that too high, I

2    might have varied downwardly, but given this lower range of 63

3    to 78 months, I think that that's a reasonable sentencing

4    range, given the seriousness of the offense, given the depth

5    and the breadth of Mr. Cabrera Da Corte's conduct, given his

6    role in getting others into this criminal activity, at least

7    his codefendants, and given the need for general deterrence as

8    much as anything else in this case.

9           And so I am, therefore, going to impose a sentence at

10   the bottom of the range, of 63 months.

11          That term of imprisonment will be followed by a term

12   of three years of supervised release, with the mandatory,

13   standard, and special conditions we outlined earlier today.

14          I'm not imposing a fine because of

15   Mr. Cabrera Da Corte's financial circumstances.

16          I am imposing restitution in the amount of

17   $3,578,786.69, and I am ordering forfeiture in the amount of

18   $1,200,000.

19          I must also order a mandatory special assessment of

20   $100.

21          Ms. Deininger, is there any legal reason why I may not

22   impose this sentence?

23          MS. DEININGER:  No, your Honor.

24          THE COURT:  Okay.  One moment.

25          (Pause)

NBTKCABS

1          THE COURT:  Mr. Rodriguez, is there any legal reason

2     why I may not impose this sentence?

3          MR. RODRIGUEZ:  No, your Honor.

4          THE COURT:  Mr. Cabrera Da Corte, may I ask you to

5     rise, please, sir.

6          Sir, after considering the sentencing guidelines, the

7     other Section 3553(a) factors, and the written and oral

8     submissions of the parties, and your statements to me this

9     afternoon, I find that a term of 63 months' imprisonment is

10    sufficient, but no greater than necessary, to comply with all

11    of the purposes of sentencing.

12         I'm ordering that term of imprisonment to be followed

13    by a term of supervised release of three years, with the

14    mandatory, standard, and special conditions we discussed at the

15    beginning of this proceeding.

16         I am not ordering a fine.

17         I am ordering restitution, as I described earlier.

18         And I am ordering forfeiture.

19         And I must impose a mandatory special assessment of

20    $100.

21         Do you understand, sir, that that is your sentence?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  Please be seated, sir.

24         Mr. Cabrera Da Corte, to the extent that you have not

25    waived this in your plea agreement with the government, you

1    have the right to appeal from your conviction and from your

2    sentence.  If appeal is something in which you're interested,

3    please let your attorney know, because he is familiar with the

4    process by which an appeal is taken.

5           Generally speaking, you have two weeks to file a

6    notice of appeal from the date that the written judgment is

7    entered.

8           My expectation is that the written judgment would be

9    entered sometime later on this week.  So if appeal is something

10   that you're interested in, please speak with your attorney.

11          Do you understand that, sir?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Mr. Rodriguez, is there a place of

14   designation that you would like me to recommend for your

15   client?

16          MR. RODRIGUEZ:  Yes, your Honor.

17          On behalf of the defendant, we would like if the Court

18   would recommend an institution as close as possible to Miami,

19   to the State of Florida.  Miami FCI medium would be ideal.

20          THE COURT:  You're asking for Miami FCI, sir?

21          MR. RODRIGUEZ:  Yes, ma'am.

22          THE COURT:  Okay.

23          I'm not as familiar -- I imagine it would be --

24          MR. RODRIGUEZ:  There's FCI medium and low and a camp.

25   It's the low and a camp, FCI low and a camp, and FCI would be

1  the institution which is outside Miami.

2          THE COURT:  Okay.

3          MR. RODRIGUEZ:  If possible.

4          THE COURT:  I will make that recommendation, sir.

5          May I please hear from the parties:  It would be my

6  expectations, given that the government consented to bail, that

7  the government would also consent to a surrender date in this

8  case.

9          Am I correct, Ms. Deininger?

10         MS. DEININGER:  That's correct, your Honor.

11         THE COURT:  Okay.

12         And, Mr. Rodriguez, I'm imagining your client would

13  prefer to surrender at a later date than be remanded today?

14         MR. RODRIGUEZ:  Yes, your Honor.

15         THE COURT:  Let's, then, talk about that, please.

16         I have had some difficulty in getting designations in

17  recent months.  So I am going to suggest Thursday,

18  February 1st, before 2:00 o'clock.

19         Is that acceptable to both sides?

20         MR. RODRIGUEZ:  That's fine.

21         MS. DEININGER:  Yes, your Honor.

22         THE COURT:  All right.

23         Mr. Rodriguez, let me just impose upon you this

24  obligation, sir:  If Mr. Cabrera Da Corte has not been

25  designated, and we're getting near the end of January, please

NBTKCABS

```
 1    let me know, and I will see if I can reach out to someone in
 2    the BOP to expedite the designation.
 3              MR. RODRIGUEZ:  Yes, your Honor.
 4              THE COURT:  I've just had a couple of people for whom
 5    it wasn't done, and then they surrendered at the MDC here in
 6    Brooklyn, and I don't think your client wants to come and do
 7    that.  So just let me know if he hasn't been designated.
 8              MR. RODRIGUEZ:  Yes, your Honor.
 9              THE COURT:  Okay.  Thank you.
10              Ms. Deininger, I believe there are perhaps open
11    counts?
12              MS. DEININGER:  Yes, that's correct.
13              The government would move to dismiss any open counts
14    against the defendant.
15              THE COURT:  That motion is granted.
16              Ms. Deininger, I appreciate you staying as late as you
17    have this afternoon.  From the government's perspective, is
18    there anything else for me to address today?  I have signed the
19    order of restitution and the order of forfeiture.
20              MS. DEININGER:  Thank you.  Nothing further.
21              THE COURT:  Thank you.
22              Mr. Rodriguez, anything else to address today, sir?
23              MR. RODRIGUEZ:  No, your Honor.  Thank you very much.
24              THE COURT:  Sir, I thank you very much as well.
25              And if I may just address your client directly?
```

1            MR. RODRIGUEZ:  Yes, ma'am.

2            THE COURT:  Okay.

3            Mr. Cabrera Da Corte, I will say this — I say this

4    almost every time, I will say this today — my great hope is

5    that you and I not see each other in this circumstance again.

6    You've said to me that you don't want to return to jail, that

7    you will never see me again, and I hope that that's correct.  I

8    hope the time passes quickly, that you're reunited with your

9    son — son — and that your family continues to support you.

10           Thank you, all, very much.  We're adjourned.

11           (Adjourned)